UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                    CRIMINAL ACTION

VERSUS                                      No. 08-140

MOSE JEFFERSON                              SECTION "B"(1)
RENEE GILL PRATT

ORDER AND REASONS

Oral argument was held on January 12, 2011 concerning Defendant Mose Jefferson's Motion to Continue (Rec. Doc. No. 574), Defendant Renee Gill Pratt's Renewed Motion for Severance (Rec. Doc. No. 568), and Defendant Renee Gill Pratt's Second Renewed Motion to Quash Jury Venire or Alternatively for Change of Venue (Rec. Doc. No. 579), all of which are opposed by the Government. Defendant Jefferson's counsel indicated his client waived his presence at hearing on the Motion to Continue Trial due to medical reasons, but did not do so relative to other motions. Defendant Gill Pratt was present for today's hearings.

**I.   Defendant Jefferson's Motion to Continue**

Defendant Mose Jefferson seeks a continuance of the trial as to him without date, due to medical reasons and his physical inability to stand trial. Rec. Doc. No. 574-1, at 5-6. After considering testimony from three different doctors, but primarily that of Defendant's treating physicians, Dr. Brian Boulmay and Dr. Ben Barker, Defendant's medical records, and supporting materials

1

from the parties' briefs on the Motion to Continue,

**IT IS ORDERED** that the matter is **RECESSED** to give the Court the opportunity to observe Defendant's condition, including logistical issues that may become necessary if trial proceeds now or later.  *United States v. Brown*, 821 F.2d 986 (4th Cir. 1987) (Among other factors, observing Defendant's activities is a factor in considering the degree to which a Defendant's health might impair his participation in his defense, especially the right to be present at trial, to testify on his own behalf, and to confront adverse witnesses).

## II.  Defendant Pratt's Motion for Severance

At the hearing, Defendant  Pratt withdrew her Motion for Severance to join Defendant Jefferson's Motion to Continue, because Defendant  Pratt's attorney did not want the Motion for Severance to adversely impact the Motion to Continue.  However, the Court found that if the Motion to Continue is granted as to Defendant Jefferson, trial would still proceed on its currently scheduled date as to  Pratt.  Accordingly,

**IT IS ORDERED** that the Motion to Continue is **DENIED** as to Defendant Pratt, without prejudice as to Defendant Jefferson's pending request for trial continuance for medical reasons.

## III. Motion to Quash Jury Venire or Alternatively for Change of Venue

### A.   Motion to Quash Jury Venire

2

Defendant Pratt asserts that she adopts the authorities and arguments previously submitted, which include a Sixth Amendment claim regarding the right to a jury selected at random from a fair cross-section of the community and a claim based on the Jury Service and Selection Act. *See* Rec. Doc. Nos. 331-1, 477-1.

**1.    Sixth Amendment and the Fair Cross-Section Requirement**

The framework for establishing a prima facie violation of the fair cross-section requirement of the Sixth Amendment was set forth by the United States Supreme Court in *Duren v. Missouri*, 439 U.S. 357 (1979), and was recently employed by the Court in *Berghuis v. Smith*, 130 S.Ct. 1382 (March 30, 2010).   Specifically, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of the group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process. *Duren*, 439 U.S. at 364.  If a prima facie case of a violation is made, the burden then shifts to the government to demonstrate that attainment of a fair cross section is incompatible with a significant state interest.  *Id*. at 368.

In *Duren*, the United States Supreme Court found that the petitioner had met his burden by showing that over 50% of adults in the community were women yet less than one of every six prospective

jurors was female, resulting in 85% of the average jury being male. *Id.* at 365-66.  Additionally, the petitioner demonstrated that this large discrepancy occurred in every weekly venire for nearly a year and was the result of the operation of Missouri's exemption criteria.  *Id.* at 366-67.

The Fifth Circuit addressed this issue in *United States v. Williams,* 264 F.3d 561 (5th Cir. 2001).  The court stated that the defendant's failure to establish a *prima facie* case as to any one of the above three elements defeats the claim.  *Id.* at 568-569. The court found that the first prong of the *Duren* analysis was met as African-Americans constitute a distinctive group in the community.  *Id.* at 568.  In analyzing the second prong, the court stated that the test focuses on whether the representation of African-Americans in the challenged venire was fair and reasonable in relation to the number of African Americans in the community - specifically those eligible to serve as jurors in the Southern District of Mississippi.[1]  *Id.*  Additionally, the Fifth Circuit has held that a statistical discrepancy[2] of up to 11.22% between the number of Hispanics in the venire and the number eligible for jury

---

[1]The *Williams* court failed to address the third prong as it found that the second was not met and therefore the petitioner did not set forth a prima facie violation.

[2]This is determined by measuring the difference between the percentage of members of the distinctive group in the relevant population and the percentage of group members on the jury wheel.  This is known as the "absolute disparity test" which is utilized by the Fifth Circuit.  *See United States v. Garcia*, 121 F.3d 704, n.10 (5th Cir. 1997); *United States v. Maskeny*, 609 F.2d 183, 190 (5th Cir. 1980).

4

duty was insignificant to establish a prima facie case of a fair cross section violation. *United States v. Quiroz*, 2005 WL 1427692 at *2(5th Cir. 2005) (unpublished) (citing *Thompson v. Sheppard*, 490 F.2d 830 (5th Cir. 1974)(finding an 11% disparity between the number of African-Americans in the community and those in the jury wheel insignificant)).

The Fifth Circuit has also stated that the third prong of the *Duren* test requires an independent showing that the discrepancy is systematic. *Parades v. Quarterman*, 574 F.3d 281, 290 (5th Cir. 2009). It must be shown that the underrepresentation was inherent in the particular jury selection process utilized, as was the case in *Duren*, and one incidence of a jury venire being disproportionate is not sufficient evidence of a "systematic" exclusion. *Timmel v. Phillips*, 799 F.2d 1083, 1086-87 (5th Cir. 1986).

Defendant does not set forth a *prima facie* case of a Sixth Amendment violation of the fair cross-section under the *Duren* test. In considering the second prong of the test, absent is any evidence as to the number or percentage of African-Americans in the community who are qualified to serve as jurors. Not all registered voters are also qualified to serve as jurors, and reports previously relied on by Defendant[3] are based on a jury wheel that is no longer in use. Additionally, Defendant relies on the eight

---

[3]*See* Report of Dr. Andrew Beveridge, dated June 21, 2006. Rec. Doc. No. 477-1, Exhibit 6.

petit venire panels from which juries were selected in this Court
from January 14, 2008 to March 30, 2009.  However, this method is
incorrect, as petit venire panels are not to be considered as a
basis for meeting the second prong of the *Duren* test, but rather
the larger group of persons returning questionnaires and found
qualified to serve should be used.  *See United States v. Royal*, 174
F.3d 1, 7 (1st Cir. 1999); *United States v. Jackman*, 46 F.3d 1240,
1244 (2d Cir. 1995); *United States v. Maskeny*, 609 F.2d 183, 190
(5th Cir. 1980).   Finally, according to the most
recent available data, a 7.4% difference exists between the
percentage of African-Americans in the Qualified Jury Wheel and the
percentage of African-Americans registered to vote in the Eastern
District of Louisiana.  *See* Rec. Doc. No. 586-1, Exhibits A; Rec.
Doc. No. 586-2, Exhibit B.  This percentage is clearly insufficient
under Fifth Circuit jurisprudence to satisfy the second prong of
the *Duren* test.

     The third prong of the *Duren* test has also not been satisfied.
Defendant contends that the system utilizes inadequate procedures
to find current addresses for transient voters, and using Orleans
Parish as an example, argues that addresses should be drawn from
state driver's license and identification card lists in addition to
voter registration lists.  *See* Rec. Doc. No. 331-1 at 8-9; Rec.
Doc. No. 477-1, at 9-10.  She additionally asserts that the Clerk

of Court procedures in failing to locate prospective jurors whose questionnaires have not been returned or have been returned by the United States Post Office are a cause of the disparity. *See* Rec. Doc. No. 331-1, at 3-4; Rec. Doc. No. 477-1, at 3-5. However, the Jury Plan of the Eastern District of Louisiana and the procedures adopted by and carried out by the Clerk of Court have been challenged and upheld several times after Hurricane Katrina, explicitly in the face of claims that any underrepresentation is due to systematic exclusion, and this Court fully agrees with those decisions. *See United States v. Spencer*, No. 04-162, at *4-5 (E.D.La. Jan. 27, 2006) (Berrigan, J.); *United States v. Haynes*, 2006 WL 1236059, at *2 (E.D.La. May 3, 2006) (Berrigan, J.); *United States v. Hardy*, 2006 WL 1663813, at *3 (E.D.La. May 3, 2006)(Berrigan, J.); *United States v. Jones*, 2006 WL 278248, at *3 (E.D.La. Feb. 3, 2006) (Africk, J.); *United States v. Dixon*, 2006 WL 278258, at *5 (E.D.La. Feb. 3, 2006) (Barbier, J.); *United States v. Caldwell*, No. 06-23, Rec. Doc. No. 350, at 37-38 (E.D.La. July 6, 2006) (Engelhardt, J.). Interestingly, at least one section of our Court reported selection of an all African-American trial jury on August 31, 2009. *See Pearce v. Zurich American, et al*, No. 08-3724 (E.D.La. Sept. 1, 2009) (Africk, J.).

Accordingly, Defendant Gill Pratt has failed to set forth a *prima facie* case under the *Duren* test of a Sixth Amendment violation of the fair cross-section.

### 2.    The Jury Service and Selection Act

Defendant Gill Pratt similarly maintains that the jury selection process of the Eastern District of Louisiana violates the Jury Selection and Service Act ("JSSA"), 28 U.S.C. §§ 1861 et. seq. Rec. Doc. No. 331-1, at 10; Rec. Doc. No. 477-1, at 11.  She argues that the selection of jurors for the Qualified Wheel is not random due to inadequate procedures for following up on unreturned juror questionnaires, which results in substantial underrepresentation of African-Americans.  *Id.*  Specifically, she claims that "[t]he mathematical odds of African-Americans being selected for the Qualified Wheel are not substantially equal to that of whites because the African-American population is concentrated in Orleans Parish, and residents of Orleans Parish are less likely to live at the addresses in the master jury wheel (which is drawn only once every four years) than are residents on other parts of the district."  *Id.*

To prevail on a JSSA claim, a defendant "must allege and prove a substantial failure to comply with the provisions of the Act." *United States v. McKinney*, 53 F.3d 664, 570 (5th Cir. 1995).[4]  The Fifth Circuit has defined a substantial failure as "one that destroys the random nature or objectivity of the selection

---

[4]Additionally, 28 U.S.C. § 1867(a) requires a JSSA challenge to be made within seven days after the defendant discovered, or, by the exercise of due diligence, could have discovered the grounds for such a motion.  As the relevant data underlying Defendant's motion has been available for months, the timeliness of this motion is questionable at best.

process." *United States v. Hemminson*, 157 F.3d 347, 358 (5th Cir. 1998).  As set forth above, this Court agrees with the numerous decisions upholding the Jury Plan of the Eastern District of Louisiana against recent challenges regarding the selection process.  *See supra*, at 6-7.  Additionally, the Fifth Circuit has found that the failure of the Clerk of Court to use driver's license lists to supplement voter registration lists is not a violation of the JSSA.  *See United States v. Reyes*, 2007 WL 3208785, at *2 (5th Cir. 2007).

**B.   Motion to Change Venue**

Defendant also relies on previous submissions to the Court in support of a Motion to Change Venue due to pretrial publicity.  *See* Rec. Doc. Nos. 269-1, 475-1.

The United States Supreme Court recently addressed a change of venue motion due to pretrial publicity in *Skilling v. United States*, 130 S. Ct. 2896 (June 24, 2010), where the Court held that the district court did not err in denying Skilling's motion for a change of venue based on a presumption of prejudice. *Skilling*, 130 S. Ct. at 2917.  Skilling was a top executive of the Enron Corporation.  The Court began its analysis by discussing prior cases in which it found a presumption of prejudice to exist.

The Court first considered *Rideau v. Louisiana*, 373 U.S. 723 (1963), where police filmed their interrogation with Rideau,

without his knowledge, at which they obtained his detailed confession of the crimes for which he was charged - namely, robbery, kidnapping, and murder.  On three separate occasions shortly before the trial, a local television station broadcast the film to audiences ranging from 24,000 to 53,000 individuals. Rideau moved for a change of venue, claiming he could not receive a fair trial in the parish where the crime occurred, which had a population of approximately 150,000 people.  The trial court denied the motion, Rideau was convicted, and the Louisiana Supreme Court upheld the conviction.  The United States Supreme Court reversed, finding that for those who saw and heard the film, the interrogation was "in a very real sense...Rideau's trial at which he pleaded guilty."  *Id.* at 726.  The Court therefore held, without examining a particularized transcript of the *voir dire*, that the "kangaroo court proceedings" trailing the televised confession violated due process.  *Id.* at 726-27.

Subsequently, the Court held in *Estes v. Texas*, 381 U.S. 532 (1965), that media coverage manifestly tainted the criminal prosecution due to excessive exposure during preliminary court proceedings, as reporters and television crews overran the courtroom and "bombarded...the community with the sights and sounds of" the pretrial hearing.  The Court found that the media's overzealous reporting efforts "led to considerable disruption" and denied the "judicial serenity and calm to which [Estes] was

10

entitled."  *Id.* at 536.

Additionally, in *Sheppard v. Maxwell*, 384 U.S. 333 (1966), the Court found that the pretrial media coverage, which was characterized as "months [of] virulent publicity about Sheppard and the murder," did not alone deny due process.  *Sheppard*, 384 U.S. at 354.  However, the Court reversed the murder conviction because the trial was pervaded by a "carnival atmosphere," as news reporters practically took over the courtroom, causing bedlam and thrusting the jurors "into the role of celebrities."  *Id.* at 355, 358.

The Court noted that although it overturned a conviction in each of these cases because the trial atmosphere was "utterly corrupted by press coverage," its decisions "cannot be made to stand for the proposition that juror exposure to...news accounts of the crime...alone presumptively deprives the defendant of due process."  *Murphy v. Florida*, 421 U.S. 794, 798-99 (1975); *Patton v. Yount*, 467 U.S. 1025 (1984).  Moreover, ignorance is not a prerequisite for juror impartiality, and a presumption of prejudice will only exist in the extreme case.  *Skilling*, 130 S. Ct. at 2914-15 (citing *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *Reynolds v. United States*, 98 U.S. 145, 155-56 (1879)).  The Court then distinguished Skilling's prosecution from those in which it previously found a presumption of juror prejudice to exist.  The Court first considered the size and characteristics of the community in which the crime occurred.  *Skilling*, 130 S.Ct. at

2915.  As opposed to the parish population of 150,000 in *Rideau*, Skilling's trial took place in Houston, where over 4.5 million individuals were eligible for jury duty.  *Id.*  "Given this large, diverse pool of potential jurors, the suggestion that 12 impartial individuals could not be empaneled is hard to sustain."  *Id.* (citing *Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991) (finding the same regarding the Washington D.C. area which has a population of over 3 million and hundreds of murders committed each year); *Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991) (drawing venire from a pool of over 600,000 individuals lessened the likelihood of prejudice)).

Second, the Court noted that, in contrast to *Rideau*, "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight."  *Id.* at 2916.  "No evidence of the smoking-gun variety invited prejudgment of [Skilling's] culpability."  *Id.* (citing *United States v. Chargra*, 669 F.2d 241, 251-52, n.11 (5th Cir. 1982)).  Instead, pretrial publicity in this matter was less memorable and prejudicial.  *Id.*

Third, over four years had passed between Enron's bankruptcy and Skilling's trial, and the level of media attention had somewhat lessened during that time.  *Id.*  The Court noted that in *Rideau* trial swiftly followed the widely reported crime.  *Id.*

Finally, the Court considered the fact that Skilling's jury had acquitted him of nine insider-trading counts, thereby undermining the supposition of juror bias. *Id.*

Accordingly, the Court concluded that the matter at issue shared little in common with the cases in which it approved a presumption of juror prejudice. The Court reiterated that "pretrial publicity - even pervasive, adverse publicity - does not inevitably lead to an unfair trial." *Id.* (citing *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 554 (1976)). Additionally, the district court employed an extensive screening questionnaire and follow-up *voir dire* to satisfy the careful identification and inspection of prospective jurors and their connections to Enron, as necessitated by the widespread community impact. *Id.* at 2917. The Court therefore held that no presumption of prejudice existed and thus the District Court did not exceed constitutional limitations in declining to order a venue change. *Id.*

Recent Fifth Circuit jurisprudence additionally states that "a change of venue should not be granted on the mere showing of widespread publicity." *United States v. Whitmore*, 2010 WL 2802393, *3 (5th Cir. July 15, 2010); *United States v. Lipscomb*, 299 F.3d 303, 343-44 (5th Cir. 2002); *United States v. Parker*, 877 F.2d 327, 330 (5th Cir. 1989); *Calley v. Callaway*, 519 F.2d 184, 205-206 (5th Cir. 1975). However, a presumption of prejudice can arise if "an appellant can demonstrate that prejudicial, inflammatory publicity

about his case so saturated the community from which his jury was drawn as to render it virtually impossible to obtain an impartial jury." *Parker*, 877 F.2d 327, at 330-31 (citing *United States v. Chagra*, 669 F.2d 241, 250 (5th Cir. 1982)). Nevertheless, the court in *Parker* found that a presumption of prejudice did not arise, because the publicity did not involve incriminating information and thus was not the type that would influence a decision by a potential juror. *Parker*, 877 F.2d at 331. The court further stated that even if a presumption of prejudice existed, that presumption may be rebutted by demonstrating from the *voir dire* that an impartial jury was actually empaneled.[5] *Id.* (citing *United States v. Harrelson*, 754 F.2d 1153, 1159 (5th Cir. 1985); *Chagra*, 669 F.2d at 250).

In evaluating the factors set forth in *Skilling*, this case clearly does not near the extreme circumstances of *Rideau*. The Eastern District of Louisiana encompasses a large geographic area comprised of a community with a variety of social, political, and cultural characteristics, and the publicity surrounding the Jefferson family did not contain any confession or other evidence of the "smoking-gun variety." Additionally, this Court has already indicated its intention to determine which jurors may have already formed an opinion in this matter due to pretrial publicity by way

---

[5]The United States Supreme Court did not reach the issue of whether the presumption could be rebutted in *Skilling* as it found that no presumption existed. *See Skilling*, 130 S.Ct. 2896, at 2917, n.18.

of extensive juror questionnaires and general and individualized *voir dire*. A presumption of prejudice based on pretrial publicity does not exist here.

Based on the foregoing, the Second Renewed Motion to Quash Jury Venire or Alternatively for Change of Venue is hereby **DENIED** as to Defendant Pratt; however, as Defendant Jefferson's Motion to Continue remains open, this decision is without prejudice to Defendant Jefferson.

**IT IS FURTHER ORDERED** that Counsel for Defendant Jefferson must obtain a written waiver from Defendant Jefferson of any privacy issues regarding his medical condition, **due no later than January 20, 2011.**

**IT IS FURTHER ORDERED** that the pretrial conference will be held on **January 20, 2011, at 3:00 p.m.** in Chambers.

New Orleans, Louisiana, this 14th day of January, 2011.

_____
United States District Judge